**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| NOBLE CORPORATION PLC, *et al.*, | Case No. 20-33826 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OBJECTION TO THE PARAGON**
**LITIGATION TRUST'S EXPEDITED MOTION FOR RELIEF**
**FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1)**

Noble Corporation plc ("Noble") and certain of its affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" and together with their non-debtor affiliates, the "Company"), hereby object to *The Paragon Litigation Trust's Expedited Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1)* [Docket No. 65] (the "Motion") filed by the Paragon Litigation Trust (the "Trust" or "Movant"). In support of this objection (the "Objection"), the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

1.     The Trust seeks to lift the automatic stay in order to pursue its $2.6 billion fraudulent transfer lawsuit against the Debtors and Noble's Board (the "Delaware Litigation") in the Delaware bankruptcy court (the "Delaware Court"). According to the Trust, lifting the stay is "efficient" because the Delaware Litigation is ready for trial; and therefore, plowing full speed

---

[1]     Due to the large number of Debtors in these jointly administered chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/noble. The location of Debtor Noble Corporation plc's principal place of business in the United States and the Debtors' service address in these Chapter 11 Cases is 13135 Dairy Ashford, Suite 800, Sugar Land, Texas 77478.

ahead with a three-week trial for a 2 million document, 25 deposition case will "*minimize[]*

interference with the Debtors' bankruptcy." (Motion ¶ 35.) This, notwithstanding that key

members of the Debtors' management will have to testify at and/or coordinate and monitor the

$2.6 billion trial *at the very same time* that they are obligated by their restructuring support

agreement (the "RSA") to be finalizing a plan of reorganization, disclosure statement, exit

financing documents and rights offering materials.

2.      The Trust purports to support this facially nonsensical argument with generalized

case law platitudes having nothing to do with the specific facts of these Chapter 11 Cases. It

therefore is appropriate to put the Motion it its proper context. Liquidating the Trust's claims in

the Delaware Court will significantly delay the administration of these Chapter 11 Cases. Thus,

under Bankruptcy Code section 502(c), they are subject to *mandatory* estimation proceeding in

*this* Court. The Debtors already have moved to hold this estimation proceeding in September (or

early October if necessary); and have proposed a maximum two-day hearing. This mandatory

estimation proceeding will enable the Debtors to emerge from Chapter 11 within a matter of a few

months and, therefore, by definition, is far more efficient than the alternative posed by the Trust –

especially because any decision by the Delaware Court will be in limbo for years while it is

appealed, first to the district court and then to the Third Circuit Court of Appeals before it is finally

resolved. This fact, by itself, is sufficient to deny the Motion. *In re Choice ATM Enters., Inc.*, No.

14-44982, 2015 WL 1014617, at *1-2, *5-6 (Bankr. N.D. Tex. Mar. 4, 2015) (denying motion to

lift the stay though petition was filed three days before trial and estimating litigation claim instead);

*see also In re John Q. Hammons Fall 2006, LLC*, No. 16-21142, 2017 WL 4620872, at *3 (Bankr.

D. Kan. Oct. 13, 2017) (in considering whether to lift the stay to allow litigation to proceed, "courts

must bear in mind that 'the process of determining the allowance of claims is of basic importance to the administration of a bankruptcy estate'" (citation omitted)).

3.      Moreover, far from "minimizing" interference with the Debtors' bankruptcy, lifting the stay will stop these Chapter 11 Cases in their tracks, and seriously jeopardize the viability of the Debtors' proposed reorganization as embodied in the RSA that the Debtors have spent months heavily negotiating with their largest creditor groups.

4.      First, depending on the outcome of the Delaware Litigation, the Trust stands to share *pro rata* in distributions of the reorganized debtors' stock with Legacy Noteholders. But those holders understandably are not prepared to wait for years, as the Delaware Litigation works its way through the courts, to know what they will receive under the plan.  The Trust itself concedes its claims "must be addressed for the Debtors to have a confirmable plan here." (Mot. at 3.)  It cannot be the case that the Debtors should be required to wait literally for years in order to achieve a confirmable plan.

5.      More importantly, and again depending on the outcome of the Delaware Litigation, the Trust may have a right to participate *pro rata* with Legacy Noteholders in a $200 million offering of second lien notes that will afford the Legacy Noteholders and the Trust significant additional equity. But the Debtors and their other stakeholders cannot hold the rights offering in abeyance indefinitely as the Delaware Litigation plods forward. Such an approach would be catastrophic to the business as customers, vendors and employees around the world are plunged into limbo and the Debtors' liquidity slowly diminishes. Stakeholders cannot rationally be expected to shoulder such risk, and it is for this reason that the Debtors' noteholders may terminate the RSA if the Corporate Claims are not estimated much more efficiently and inexpensively in this Court in accordance with the RSA's milestones.

6.      The decisive factor in determining whether to lift the stay "is the effect of such litigation on the administration of the estate; even *slight interference* with the administration [of the estate] may be enough to preclude relief." *In re UTEX Commc'ns Corp.*, 457 B.R. 549, 570 (Bankr. W.D. Tex. 2011) (emphasis added); *Anderson v. Hoechst Celanese Corp. (In re U.S. Brass Corp.)*, 173 B.R. 1000, 1006 (Bankr. E.D. Tex. 1994). Indeed, Congress itself highlighted a litigation's "interference with the pending bankruptcy" as a key factor that warrants denial of a lift stay motion. *In re Choice,* 2015 WL 1014617 at *3 (quoting H.R. Rep. No. 95-595, at 343 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 6300).

7.      In stark contrast to the severe adverse consequences to the Debtors and their stakeholders if the stay is modified, the Trust will only face a temporary delay if the stay remains in place. Estimation of the Corporate Claims in this Court will not prejudice the Trust's ability to pursue the Delaware Litigation against the non-Debtor defendants, who have D&O insurance coverage of $200 million, after these Chapter 11 Cases likely conclude by late fall. The Trust's harm argument, which boils down to "we've been at this a while, we want to go forward," is not going to balance the harms in its favor. This argument should sound familiar, as it was used just yesterday by the movant in *In re Chesapeake Energy Corporation*, No. 20-33233 (Bankr. S.D. Tex. Aug. 12, 2020) (Jones, J.) [Docket No. 731].  The Court rejected it, holding that the plaintiffs' desire to go to trial did not establish cause sufficient to lift the stay.  Respectfully, the Trust should suffer the same result as the movant in *Chesapeake Energy*.

8.      As set forth below, the Trust has not carried its heavy burden on this Motion. The Motion should therefore be denied.

*                    *                    *                    *

9.      While this is neither the time nor place to debate in detail the underlying merits of the Delaware Litigation, a brief rejoinder to the Trust's rendition is in order. Rather than address the Trust's decidedly subjective and highly disputed interpretation of certain emails and documents, the Debtors note the following objective indisputable facts bearing on the two critical issues in any fraudulent transfer case: whether the company was solvent and/or received reasonably equivalent value at the time of the transaction.

10.     On the day of the spin-off, Paragon's publicly traded stock price traded at over $11 per share.[2] Courts have found such contemporaneous market evidence conclusive on the question of solvency.[3]

11.     The Trust's *own industry expert* published a report virtually contemporaneous with the spin-off valuing Paragon's rigs at *$3.44 billion* (Paragon's liabilities totaled $1.7 billion).[4] The Debtors received a solvency opinion from Houlihan Lokey assigning a mid-point valuation for Paragon of $3.7 billion.[5] R.S. Platou, whom the Trust ironically cites in its Motion, also valued the Paragon rigs at $3.4 billion after performing a rig-by-rig valuation exercise.[6] Citibank and Deutsche Bank, two highly sophisticated financial institutions with extensive experience lending to the oil industry, agreed to finance Paragon on a stand-alone basis. And contrary to the Trust's unsubstantiated claim that lenders relied on Noble's allegedly artificially elevated projections, both

---

[2]    *See* Ex. A, (Bloomberg Pricing Information for Paragon Offshore plc).

[3]    *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (holding that public trading price of stock is better evidence of value and solvency in fraudulent conveyance suit than the opinions of experts developed long after the fact for litigation purposes).

[4]    Ex. B, (Jeff Spittel & Haithum Nokta, *"Get Your Yaya Tourés Out,"* Clarkson Offshore Servs. Monthly, June 27, 2014).

[5]    Ex. C, (Presentation to the Board of Directors of Noble Corporation plc dated July 11, 2014, Noble_00258228 at 4).

[6]    Ex. D, (R.S. Platou, *"Fair Market Valuation of the Noble Spinco fleet,"* Jan. 24, 2014).

lenders testified they prepared their own independent projections as part of their rigorous internal credit assessments.[7] In addition, the preponderance of independent contemporaneous analyst reports had 12-month price targets for Paragon that exceeded its then trading price. All of this objective independent evidence overwhelmingly proves solvency and reasonably equivalent value.

12.     To be sure, Paragon ultimately was forced into bankruptcy. Why? This Court is well aware of the unprecedented collapse of the oil industry beginning in late 2014. The price of oil on the day of the spin-off was approximately $103 per barrel; on the day Paragon filed for Chapter 11 protection, the price of oil had collapsed to approximately $31 per barrel.[8] The Trust's own industry expert confirmed that the post-spin-off collapse was the worst in the industry's history.[9] And, not surprisingly, Paragon's Chapter 11 Disclosure Statement confirmed that its bankruptcy was the direct result of this unforeseen collapse in the oil market.[10]

13.     In the Motion, the Trust ignores these truths and instead, suggests that Paragon's bankruptcy was due to its "old and cold," poor quality standard specification rigs that were at or near the end of their useful lives. But the Trust knows better. As the assignee of Paragon's claims, the Trust is well aware of, and is bound by, Paragon's prior judicial representations in its Chapter 11 case *rejecting* this very argument:

> The Term Loan Agent fails to take into account the actual condition of the Debtors' fleet, instead making sweeping assumptions regarding the condition and competitiveness of the Debtors' rigs based solely on the delivery year of each rig. *The Debtors' rigs have been well-maintained, upgraded, refurbished, and rebuilt to such a degree that their actual age is irrelevant with respect to the Debtors'*

---

[7]     Ex. E, (Excerpts from Deposition of Derrick Andrew Lenz at 54:10-55:12, 67:25-68:12, 72:13-24); Ex F, (Excerpts from Deposition of Stephen Cunningham at 224:15-225:18).

[8]     Ex. G, *See Europe Brent Spot Price FOB*, U.S. Energy Info. Admin. (August 13, 2020), https://www.eia.gov/dnav/pet/hist/RBRTED.htm

[9]     Ex. H, Expert Report of Jeffrey Spittel, at 17.

[10]    *In re Paragon Offshore plc*, Bankr. Case No. 16-10386 (CSS), D.I. 1460, Disclosure Statement for Fifth Joint Chapter 11 Plan of Paragon Offshore PLC and its Affiliated Debtors, filed May 2, 2017, at 16-17.

*ability to compete in the markets in which they operate. In fact, the Debtors' rigs are often preferred over newer rigs because of their proven track records, experienced crews, and lower cost.*[11]

14.     Indeed, the Delaware Court agreed with Paragon and explicitly *rejected* the Trust's current position, pointing to the "unusually high" amount of money Noble had spent on the Debtors' rigs prior to the spin-off, and determining that, "[b]ecause Noble already updated the rigs, including spending on long-lived capital equipment, Paragon will not have to spend as much money going forward."[12]

15.     Having responded to the Trust's merits discussion, set forth below is the legal analysis compelling the denial of the Motion.

## BACKGROUND

### A.     Modification of the Stay Would Completely Derail These Chapter 11 Cases

16.     The Debtors entered Chapter 11 with a plan, embodied in the RSA, to eliminate all of their unsecured bond debt in the amount of approximately $4 billion. The RSA was signed by approximately 70% of the holders of the Debtors' Priority Guaranteed Notes and approximately 45% of the Debtors' Legacy Notes. The proposed restructuring is also supported by a steering committee of the Debtors' unsecured revolving lenders, who will be refinanced with proceeds of a new exit facility upon emergence from Chapter 11. The restructuring contemplates another $200 million in liquidity upon emergence in the form of second lien notes that will be offered to holders of the Priority Guaranteed Notes, the Legacy Notes and, if allowed, the Trust.

---

[11]   Memorandum of Law in Support of Confirmation of Debtors' Second Amended Joint Chapter 11 Plan and Response to Certain Objections, at 3, *In re Paragon Offshore plc*, No. 16-10386 (CSS) (Bankr. D. Del. June 14, 2016), Docket No. 467 (emphasis added).

[12]   Findings of Fact and Conclusions of Law Denying Confirmation of the Amended Joint Chapter 11 Plan of Paragon Offshore Plc and Its Affiliated Debtors, at 43, *In re Paragon Offshore plc*, No. 16-10386 (CSS) (Bankr. D. Del Nov. 15, 2016), Docket No. 890.

17.     As is typical of virtually all restructuring support agreements, the RSA contains milestones the Debtors must meet. None of them are onerous, and none of them require expedited consideration of a disclosure statement or plan of reorganization. In particular, the RSA requires approval of a disclosure statement forty-five (45) days after it is filed, which the Debtors are endeavoring to file by the end of August. The RSA requires entry of an order estimating the Trust's claims against the Debtors (the "Corporate Claims") by the same date. Subject to the Court's schedule, the Debtors estimate that date to occur in early to mid-October. That is also when the month-long trial on the Trust's claims before the Delaware Court is anticipated to conclude. The Delaware Court easily may require many weeks to issue a ruling, after which the first round of appeals will begin.

18.     Despite the foregoing, the Trust wants to barrel ahead on the Delaware Litigation now, regardless of the disruption and breakage that will befall the Debtors' restructuring efforts. As would be expected, the Trust points to cases saying that modification of the stay may be warranted to allow pending litigation to proceed in another court if the circumstances warrant. Many of these cases are inapposite either because they do not address the fact that mandatory estimation proceedings were imminent and a more efficient means of resolving the claims,[13] or were distinguishable on other grounds.[14] The Trust also points to the length and cost of the

---

[13]     Because the parties in those cases did not present estimation as an alternative to traditional litigation, the courts did not weigh its efficiencies against the prospects of a full-blown trial. In fact, the estimation process itself is mentioned in only one of the cases cited by the Trust, *In re Marvin Johnson's Auto Service, Inc.*, 192 B.R. 1008 (Bankr. N.D. Ala. 1996), where the court warned the parties that estimation "remains available if it later becomes apparent that the state court trial will be substantially delayed or postponed for a longer period." *Id.* at 1019. As discussed below, it is a near certainty that resolution of the Corporate Claims will be delayed by the appeals process.

[14]     In support of its argument that the Delaware Court has "special expertise to decide certain issues of Delaware law," the Trust cites cases that involved niche issues under state law. *See In re Marvin Johnson's Auto Serv.*, 192 B.R. at 1017, 1020 (lifting the stay to allow a fraudulent repair of vehicle claim to proceed against the debtor in part because "[a]ll of the issues in the case strictly involve Alabama state law . . . [and] the state court should be more familiar and more experienced with state law issues than the bankruptcy court and a

litigation to date; emphasizes that the parties are trial ready; and argues that this case satisfies certain of the factors courts often consider when assessing whether the automatic stay should be lifted. Without any reference at all to the RSA and the Debtors' common-sense business need to minimize the length of its stay in Chapter 11, the Trust asserts that the Delaware Litigation "minimizes interference" with these Chapter 11 Cases and that "judicial economy" favors trial in Delaware.

**B.      The Trust's Claims Can Be Easily**
**Estimated Before This Court**

19.      The Trust's position is not realistic and flouts the unequivocal requirement of section 502(c) of the Bankruptcy Code that a court "shall" estimate contingent or unliquidated claims, "the fixing or liquidation of which, as the case may be would unduly delay the administration of the case." Indeed, the Trust essentially says that there is only *one* way to determine the Corporation Claims: through a 120-hour, 17-day, month-long trial that positively *must* begin on schedule, in the very midst of the Debtors' restructuring efforts – the timing of which had nothing to do with the scheduled trial, and instead had everything to do with business exigencies and a bond default that was set to occur on July 31, 2020 – the day the Debtors filed these Chapter 11 Cases.

20.      The Trust's position, if adopted, would throw a massive wrench into these largely consensual Chapter 11 Cases. It also would effectively read section 502(c) out of the Bankruptcy Code.  And despite all the depositions (25 of them) and documents produced (2 million pages) in

---

determination of the issues involved in the litigation will not require the expertise of a bankruptcy judge."); *In re SCO Grp.*, 395 B.R. at 855, 859 (lifting the automatic stay to allow slander of title and interference with software copyrights litigation to move forward because "the Lawsuit involve[d] many highly technical issues that the District Court ha[d] already addressed and mastered"). The Corporate Claims at issue here, by contrast, consist primarily of fraudulent conveyance actions, with which the Bankruptcy Court is undoubtedly familiar. And although the Trust argues that its claims are governed in part by Delaware law, the Corporate Claims are all pled under the Bankruptcy Code in addition to state law.

the Delaware Litigation, the Corporate Claims are run-of-the-mill fraudulent conveyance claims arising out of Noble's spin-off of Paragon (the "Spin-Off") that this Court can assess in a summary, streamlined manner. The Delaware Court has no inherent advantage over this Court with respect to fraudulent conveyance claims, and it has no head start on the facts because it has had no occasion to consider any dispositive motions. And this Court will not require days and days of live testimony or dozens of three-ring binders of exhibits to make an intelligent assessment of the strength of the Corporate Claims. The issues and arguments will be very familiar to this Court.

21.     The Trust likely will point to its litigation experts who opine on the value of Paragon's rigs in support of the Trust's argument that the value of those rigs was not "reasonably equivalent" to the value that Paragon surrendered to Noble and that Paragon was insolvent at the time of the Spin-Off. The Debtors, of course, have their own experts, whose opinions on value support the Debtors' argument that Paragon *did* receive reasonably equivalent value and *was* solvent. But counsel to each side can efficiently walk this Court through the relative strengths and weaknesses of these reports, which undoubtedly are identical to dozens, if not hundreds, of such reports that Court has reviewed over the years.

**C.     The Debtors' Leadership Team Would Be
Torn Away From Their Restructuring Obligations
If the Automatic Stay Is Modified**

22.     The Trust's assertion that a full-blown, month-long trial in Delaware "will not impose a hardship on anyone, or materially threaten the [Debtors'] ability to obtain confirmation of its plan" because "[t]rial would not even require the attendance of any current members of Noble's Board or management" is stunning. (Mot. at 16-17.) Four of Noble's current directors are named defendants. Three key members of Noble's management – including its CEO – were deposed, and at least two of them are likely to be called as trial witnesses. And the notion that

management will not be hyper-focused on the trial of a $3 billion-dollar claim that the Trust concedes must be resolved in order for the Debtors to reorganize defies logic. As discussed more fully in the Debtors' Responses and Objections to the Trust's Discovery Requests, at least the following key Noble personnel would be distracted by a trial of the Paragon Claims, all of whom are key decisionmakers or are extensively involved with the Debtors' restructuring efforts:

- William E. Turcotte, Senior Vice President, General Counsel – Mr. Turcotte attends and participates in substantially all management calls with the Debtors' professional advisors and is heavily involved in all significant restructuring decisions. He is also the key contact at Noble in connection with the Delaware Litigation, and has been throughout the litigation. Mr. Turcotte would be actively involved in witness preparation for the trial of a $3 billion case, and that he would be present for the trial.

- Julie J. Robertson, Executive Chairman, Director – Ms. Robertson is a named defendant in the Delaware Litigation, so the claims present a direct threat to her livelihood, life savings, and reputation. Ms. Robertson has devoted a substantial amount of time to issues relating to the Delaware Litigation, and will spend significantly more as the case progresses to trial. In connection with her preparation for trial, Ms. Robertson will need to devote substantial time and energy to developing her testimony, including reviewing thousands of pages of documents.

- Robert W. Eifler, President and Chief Executive Officer, Director – Mr. Eifler was deposed as a corporate representative for Noble in the Delaware Litigation based on his extensive knowledge of the offshore oil market and the Paragon rigs that are at issue in the litigation. Even if he were not called as a trial witness, his input would be essential in developing trial strategy and responding to various arguments Noble anticipates the Trust will raise.

- Laura D. Campbell, Vice President, Controller – Ms. Campbell was deeply involved in preparing disclosures and compiling information required in the Debtors' Chapter 11 filings and first day pleadings. Ms. Campbell was deposed as a corporate representative for Noble in the Delaware Litigation on the issue of impairment, and will likely be a trial witness. She will need to attend multiple preparation sessions and review at least dozens of documents to prepare for giving live testimony at trial.

- Julie H. Edwards, Director – Ms. Edwards serves as a member of Noble's Board of Directors and is extensively involved in the Debtors' restructuring. Ms. Edwards is a named defendant in the Delaware Litigation. It is difficult to imagine that she would not devote significant time to trial strategy considerations and appear at trial.

- Gordon T. Hall, Director – Mr. Hall serves as a member of Noble's Board of Directors and is extensively involved in the Debtors' restructuring. As a named defendant, Mr. Hall will undoubtedly devote substantial time and energy to trial strategy considerations, and it is

11

likely that he would appear at trial.

- Jon A. Marshall, Director – Mr. Marshall serves as a member of Noble's Board of Directors and is extensively involved in the Debtors' restructuring. Mr. Marshall is a named defendant in the Delaware Litigation, and accordingly will likely spend substantial time and energy considering Noble's trial strategy; it is likely he will also appear at trial.[15]

**D.      The Debtors Have Requested
          Streamlined Estimation of the Corporate Claims**

23.      On August 7, 2020, the Debtors filed a *Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) for Entry of Order Establishing Procedures and Schedule for Estimating the Corporate Claims* (the "Estimation Motion") [Docket No. 144]. In the Estimation Motion, the Debtors request that this Court set a schedule and streamlined process for estimating the Corporate Claims. The Estimation Motion is currently scheduled to be heard on the same date as the Motion.

## Objection

**I.      The Trust Has Failed to Establish Cause for Relief from the Automatic Stay.**

24.      The Motion should be denied because the Trust has failed to demonstrate the requisite cause. The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *Halo Wireless, Inc. v. Alenco Commc'ns, Inc. (In re Halo Wireless, Inc.)*, 684 F.3d 581, 586 (5th Cir. 2012) (quoting H.R. Rep. No. 95-595, at 340, *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6296). "The purpose of the automatic stay is 'to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'" *In re SCO Grp., Inc.*, 395 B.R. 852,

---

[15]    *See also* Ex. I, The Debtors' Responses and Objections to the Paragon Litigation Trust's Discovery Requests dated August 11, 2020.

856 (Bankr. D. Del. 2007) (quoting *Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982)).

25.     Section 362(d)(1) of the Bankruptcy Code provides for relief from the automatic stay "for cause." 11 U.S.C. § 362(d)(1). "If the movant is an unsecured creditor, the policies underlying the automatic stay weigh against granting the relief requested." *In re Residential Capital, LLC*, No. 12-12020 (MG), 2012 WL 3249641, at *3 (Bankr. S.D.N.Y. Aug. 7, 2012). Where, as here, an unsecured creditor seeks to lift the stay, it must demonstrate "extraordinary circumstances." *See, e.g.*, *In re Eagle Enters., Inc.*, 265 B.R. 671, 680 (E.D. Pa. 2001) ("Generally, unsecured creditors are entitled to relief from an automatic stay only in extraordinary circumstances"); *In re R.F. Cunningham & Co.,* 355 B.R. 408, 412 (Bankr. E.D.N.Y. 2006).

26.     In considering whether to lift the automatic stay, courts in the Fifth Circuit consider multiple factors. *See In re Choice ATM*, 2015 WL 1014617, at *4 ("Even among bankruptcy courts in this circuit, no single approach [to lifting the stay] prevails." (collecting cases)). Regardless of the factors a court considers, "[u]ltimately, the granting of relief from the automatic stay is left to the discretion of the Bankruptcy Court and decided on a case-by-case basis." *In re Fowler*, 259 B.R. 856, 858 (Bankr. E.D. Tex. 2001); *accord Reitnauer v. Tex. Exotic Feline Found., Inc. (In re Reitnauer)*, 152 F.3d 341, 343 n. 4 (5th Cir. 1998); *see also Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 253 (5th Cir. 2006) ("[I]n the past we have noted that this lack of definition [of "cause" under Bankruptcy Code section 362(d)(1)] affords 'flexibility to the bankruptcy courts.'" (citation omitted)); *accord Mendoza v. Temple-Inland Mortg. Corp. (In re Mendoza)*, 111 F.3d 1264, 1271 (5th Cir. 1997).

27.     Even under the Trust's proposed use of the "*Sonnax*" factors, it has failed to carry its burden to demonstrate cause – let alone the extraordinary circumstances that are required to lift

the stay. *See In re Barnes*, No. 03-10337 (RLJ), 2007 WL 9711446, at *5 (N.D. Tex. May 17, 2007) ("When relief from the automatic stay is sought, the party seeking the relief has an initial burden to demonstrate cause for relief." (citation omitted)), *aff'd*, 279 F. App'x 318 (5th Cir. 2008). The Trust cherry-picks nine of the *Sonnax* factors in support of its argument that the stay should be lifted. None of the Trust's factors weigh in favor of lifting the stay. Accordingly, the Court should deny the Motion.

A.     **Although the Delaware Litigation Is "Ready for Trial," It Is Far from a Final Resolution.**

28.     The Trust relies heavily on the idea that the Delaware Litigation is trial ready in support of its Motion. (*See* Mot. at 14-15.) However, given the questions about the Delaware Court's ability to finally adjudicate the claims and the rounds of appeals that are likely to follow any determination after trial, the parties are years away from a final resolution of the Paragon Claims. Indeed, the trial will not even be over – let alone post-trial briefing concluded and a decision rendered – before the Debtors are required to have the Corporate Claims resolved in order to move forward with the plan contemplated by the RSA.

29.     While the Trust is correct that the Delaware Litigation is at an advanced stage, with discovery complete and pre-trial motions fully briefed, that actually *favors* maintaining the stay. The Debtors have proposed that the Court estimate the Corporate Claims, leveraging the discovery and briefing in the Delaware Litigation that the parties have already completed. *See In re John Q. Hammons Fall*, 2017 WL 4620872, at *4-5 (denying lift stay request despite the fact that years-long litigation in Delaware was on the eve of trial and finding that the "Delaware court is presently in no better position than this Court to rule on the matter"); *id.* at *5 ("This Court is prepared to resolve the damages claim though the claim estimation process found in § 502(c). In addition, any discovery that was undertaken in the Delaware court can be used here; this Court would not permit

14

the parties to start over . . . ."); *see also In re Choice ATM*, 2015 WL 1014617, \*5 (denying lift stay request despite the fact that debtor filed Chapter 11 three days before trial and concluding that "[t]here is no judicial inefficiency inherent in proceeding in the bankruptcy court" where the court can rely upon "the previously completed discovery without redundancy to assist the court in liquidating the . . . [litigation claims] through estimation").

30.     The decision in *In re Choice ATM Enterprises, Inc.* is on all fours with the Debtors' situation. 14-44982 (DML), 2015 WL 1014617 (Bankr. N.D. Tex. Mar. 4, 2015). There, the movant sought to lift the automatic stay to allow district court litigation to proceed on breach of contract, unjust enrichment, fraud, and breach of fiduciary duty claims. *In re Choice*, 2015 WL 1014617, at \*1-2. The debtor filed Chapter 11 only three days before the scheduled trial. In denying the request to lift the automatic stay, Judge Lynn held that "given the size" of the claims and the "concomitant importance of their resolution" to the debtor's reorganization, they should be estimated in the bankruptcy court. *Id.* at \*6. He offered four principal reasons for his ruling.

31.     *First*, the interest of judicial economy favored estimation because discovery and pre-trial motions had been completed. *See id.* at \*5 (noting that the "parties can use previously completed discovery without redundancy to assist the court in liquidating the . . . [claims] through estimation."). *Second*, Judge Lynn concluded that the costs of continued litigation "would be a greater burden on the estate" than estimating the claims. *Id. Third*, because the movant's claims were critical to the debtor's reorganization, keeping the claims in the bankruptcy court would enable the "court to rapidly proceed through the claims estimation process" and avoid the delay and expense associated with the litigation. *Id.* at \*6; *id.* at \*5 ("[T]he Code's highly efficient claims estimation process may improve Debtor's chances at a reorganization through an accelerated

process without significantly harming . . . [the movant].”). *Finally*, the claims did not present any issues beyond the expertise of the court. *Id.* at *6.

32.     The same result is compelled here, where the Debtors propose a speedy estimation process to resolve the Corporate Claims before the Delaware Court could possibly resolve them.

**B.     The Delaware Trial Will Not Completely Resolve the Paragon Claims.**

33.     Contrary to the Trust's contention, lifting the automatic stay will not completely resolve the Paragon Claims. (Mot. at 15-16). There are substantial questions concerning the Delaware Court's authority to finally adjudicate the claims, and a lengthy appeal process will almost certainly follow any decision and order of the Delaware Court. Forcing the Debtors to wait for this process to play out before they can exit Chapter 11 would be antithetical to the bankruptcy process. *See In re GenOn Energy Inc.*, No. 17-33695 (Bankr. S.D. Tex. Oct. 19, 2017) (Jones, J.) [Docket No. 986], Hr.'g Tr. 14:19-20; *In re John Q. Hammons Fall*, 2017 WL 4620872, at *5 (“[P]ausing the bankruptcy proceedings in order for the parties to return to state court would be a great interference and further delay proceedings herein”).

34.     Moreover, even in the event of a favorable verdict in the Delaware Litigation, the Trust would still have to return to this Court to seek allowance of its claim and determine its treatment through the Chapter 11 process. Courts recognize that such circumstances weigh *against* lifting the automatic stay. *See, e.g.*, *In re WorldCom,* No. 05-cv-5704 (RPP), 2006 WL 2270379, at *8-9 (S.D.N.Y. Aug. 4, 2006) (finding that the first *Sonnax* factor weighed against lifting the stay because the movant would be required to go through the bankruptcy court claims process to collect on any judgment); *In re Nw. Airlines Corp.,* No. 05-17930 (ALG), 2006 WL 382142, at *2 (Bankr. S.D.N.Y. Jan. 13, 2006) (similar).

**C.     Lifting the Stay Will Significantly Prejudice the Debtors and Interfere With Their Ability to Reorganize.**

16

35.     The Trust is wrong that "[t]rial in Delaware minimizes interference with Noble's bankruptcy." (Mot. at 16.) In fact, the trial will interfere with – and possibly entirely thwart – the Debtors' reorganization. *See In re UTEX Commc'ns Corp.*, 457 B.R. at 570 ("[T]he most important factor is the effect of such litigation on the administration of the estate; even slight interference with the administration [of the estate] may be enough to preclude relief." (citation omitted)); *accord In re Curtis*, 40 B.R. 795, 806 (Bankr. D. Utah 1984).

### 1.     Lifting the automatic stay will jeopardize the RSA and the Debtors' ability to formulate a Chapter 11 plan.

36.     Allowing the Delaware Litigation to proceed will wreak havoc on the administration of these Chapter 11 Cases for two principal reasons. First, the RSA, which leaves general unsecured creditors unimpaired, will be at risk of being terminated. As discussed above, if the Delaware Litigation resumes, the Debtors will likely trip a milestone default in the RSA. The RSA requires that the Corporate Claims be estimated – not tried – and that they be estimated before approval of a disclosure statement this fall.

37.     Second, even if the RSA were not in place, the Debtors cannot formulate a Chapter 11 plan without an expedited resolution of the Corporate Claims. The Corporate Claims are some of the largest unsecured claims against the Debtors' estates. (*See, e.g.*, Mot. ¶ 3 ("There is no dispute that a court needs to address the Debtors' potential multi-billion liability to the Trust before the Debtors can successfully reorganize."); *id.* ¶ 4 ("This liability [Paragon Claims]—which the Trust believes exceeds $2.6 billion—must be addressed for the Debtors to have a confirmable chapter 11 plan here."); *id.* ¶ 38 (noting the Corporate Claims are the "single largest claim against the estate")). Without a final decision on the viability and amount of the Corporate Claims, the Debtors cannot propose a Chapter 11 plan. *See In re John Q. Hammons Fall*, 2017 WL 4620872, at *1, *5 ("It is difficult to see how the Delaware litigation would not interfere with the

administration of the bankruptcy estate. J.D. Holdings [litigation plaintiff] is one of Debtors' largest creditors. The proposal and confirmation of a plan will undoubtedly be impacted by the amount of J.D. Holdings' claims; pausing the bankruptcy proceedings in order for the parties to return to state court would be a great interference and further delay proceedings herein.").

38.     The Debtors cannot hold their restructuring in abeyance until the Corporate Claims are litigated and all appeals resolved. That is why, just as the court did in *Choice*, this Court should deny the Motion and estimate the Corporate Claims. *See In re Choice*, 2015 WL 1014617, *6 (denying lift stay motion and concluding estimation was preferable "[g]iven the size" of the claims and the "concomitant importance of their resolution" to the debtor's reorganization).

### 2.     Lifting the automatic stay will prejudice the Debtors by diverting their attention from expeditiously confirming a Chapter 11 plan.

39.     Lifting the automatic stay will also require the Debtors to divert time, resources, and attention to focus on a 17-day trial that would otherwise be focused on administering their estates. *See In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 623-24 (Bankr. S.D.N.Y. 2009) (denying relief from stay and concluding that "allowing the actions to proceed would distract the Debtors' management from the bankruptcy proceeding . . . thereby affecting the interests of other creditors."). The Debtors' management is in the midst of reorganizing a multi-billion-dollar company. At this critical juncture in the Chapter 11 Cases, the Debtors and their officers and directors are focused on developing a successful plan of reorganization as contemplated by the RSA. *See In re SunEdison, Inc.*, 557 B.R. 303, 308 (Bankr. S.D.N.Y. 2016) (refusing to lift the automatic stay and observing that "one of the purposes of the automatic stay is to allow the Debtors to focus on emergence from chapter 11 by granting a respite, at least temporarily, from the litigation of claims").

40.     The Debtors' directors and officers would need to dedicate substantial time to prepare for the 17-day Delaware Trial, particularly, because (1) key members of the Debtors' management are named as defendants; (2) at least three of the D&O Defendants will likely be trial witnesses; and (3) several key members of Noble's Board and management will need to turn their attention away from the restructuring to focus on the Delaware Litigation as it nears trial.[16] *See In re Comdisco, Inc.*, 271 B.R. 273, 280 (Bankr. N.D. Ill. 2002) (finding that "it would be irresponsible and subversive of the purpose of the automatic stay to allow ***any*** resources and attention of the Debtor to be diverted to other matters not directly related to its reorganization" (emphasis added)).

41.     Against all this, the Trust's assertion that the trial would "not impose a hardship on anyone" (Mot. at 16) is pure fantasy.

**D.     This Court is Fully Capable of Adjudicating the Corporate Claims.**

42.     The Trust confusingly contends that the Delaware Court has expertise over the Paragon Claims (Mot. at 17) but there is no question that this is not a situation where "a specialized tribunal has been established to hear the particular cause of action." *In re Sonnax Indus.*, 907 F.2d at 1286. This Court is fully capable of hearing the Corporate Claims, which primarily consists of fraudulent conveyance claims – indeed, such claims fall squarely in this Court's bailiwick. This factor, too, weighs against lifting the automatic stay.

**E.     The Interests of Judicial Economy Favor Maintaining the Automatic Stay.**

43.     The Trust repeatedly argues that judicial economy favors lifting the stay because the parties are on the eve of trial. (*See, e.g.*, Mot. at 17-18.) The Trust is wrong. "Judicial economy"

---

[16]     Indeed, the Delaware Court's contemplated in-person trial could subject many of the Debtors' current directors and officers to other states' COVID-19 quarantine requirements for extended periods, and thereby diverting their attention from confirming a plan and emerging from Chapter 11.

means "efficient management of litigation so as to minimize the duplication of effort and to avoid wasting the judiciary's time and resources." *Judicial economy*, *Black's Law Dictionary* (11th ed. 2019). As it stands, the Delaware Court has not ruled on any dispositive motions, nor has it even heard argument on the parties' motions *in limine* or motions for partial summary judgment. The only issue that has been substantively ruled upon by the Delaware Court concerned its constitutional authority to enter a final judgment on the Corporate Claims.

44.     Moreover, because of the appeals that are likely to be involved, the Delaware Litigation implicates the very same issues this Court found troubling in *In re GenOn Energy, Inc.*:

> COURT: The concept of staying something in a bankruptcy case, indefinitely, subject to ultimate resolution of a final, non-appealable order, entered by a court of competent jurisdiction . . . [t]hat's a non-starter with me. I'm not going to stop what is intended to be a speedy process, put it on the shelf, and wait for, you know, a Court of Appeals, and perhaps another District Court trial, and then an appeal to the Circuit, and maybe an appeal to the Supreme Court, and who knows what else. That's something that is just inherently conflicting with what I believe bankruptcy is supposed to be.

No. 17-33695 (DRJ) (Bankr. S.D. Tex. Oct. 19, 2017) (Jones, J.) [Docket No. 986]. The Debtors' restructuring cannot await entry of a decision after a full-blown trial, resolution of all likely appeals, and then a claims-allowance process in this Court. *See, e.g., In re Living Hope Se., LLC*, 505 B.R. 237, 245 (Bankr. E.D. Ark. 2014) (refusing to lift the automatic stay where even with a final judgment "there will likely be continued claims litigation in this Court").

45.     Because the parties are years away from a final resolution in Delaware, estimation, rather than lifting the stay, is appropriate. *In re Lionel L.L.C.* is instructive. No. 04-17324, 2007 WL 2261539 (Bankr. S.D.N.Y. Aug. 3, 2007). There, Judge Lifland denied a request to lift the automatic stay in favor of estimation of a $40 million claim, even though it had been pending for seven years and had already been tried and appealed. *Id.* at *4-5, *7. The court emphasized that

"this is clearly a situation contemplated by Congress for the implementation of section 502(c)." *Id.* at *7. The same is true here, and judicial economy favors maintaining the stay and estimating the Corporate Claims to avoid the years of appeals that would follow the Delaware trial.

### F. The Delaware Trial Involves Primarily Claims Against the Debtors.

46.     The Trust erroneously contends that because it is pursuing claims against ten non-debtor defendants, the stay should be lifted. (Mot. at 18.) But it is indisputable that the focal point of the Amended Complaint is the fraudulent transfer claims, not the claims against the individual defendants.

### G. The Debtors' Insurers Have Disclaimed Coverage of the Corporate Claims.

47.     The Trust wholly ignores the *Sonnax* factor concerning whether the Debtors' insurers have assumed responsibility for the Corporate Claims. Instead of addressing whether insurance is in place that would cover defense and judgment costs, *see In re Sonnax*, 907 F.2d at 1286 – the Trust instead repeats its well-worn, unavailing judicial economy trope. (*See* Mot. at 19.) Here, because the insurers have disclaimed coverage for the Corporate Claims, this factor weighs against lifting the automatic stay.[17] *See In re Residential Capital*, 2012 WL 3249641, at *5 ("The fifth *Sonnax* Factor weighs in favor of denying relief from the automatic stay because any damages awarded to Aurora [litigation plaintiff] would be paid directly by the Debtor Defendants.").

### H. The Balance of Hardships Strongly Favors Maintaining the Stay.

48.     The Trust argues that is has spent years readying the Delaware Litigation for trial and so it will be harmed by any delay of the trial. But the Motion assumes that the result of denying the Motion would be a lengthy claims-allowance process under section, which is not what the

---

[17]     *See* Ex. J, The Debtors' Supplemental Responses and Objections to the Paragon Litigation Trust's Interrogatories dated August 13, 2020; *see also* Ex. K, (Letter from Chubb dated April 27, 2018, NobleDIP_00000009); Ex. L, (Letter on behalf of Chubb dated January 28, 2019, NobleDIP_00000006).

Debtors have proposed. The Debtors seek an estimation process that will capitalize on all of the work the parties have done to date. If anything, estimation will save both parties time and resources. It is therefore difficult to conceive how estimation *harms* the Trust – let alone that any conceivable harm "considerably outweighs" the hardship to the Debtors if the trial proceeds, discussed at length above. *See In re Fowler*, 259 B.R. at 860; *see also In re Micro Design, Inc.,* 120 B.R. 363, 369 (E.D. Pa. 1990) (noting that unsecured creditors "bear the heavy and possibly insurmountable burden of proving that the balance of hardships tips significantly in favor of granting relief as against the hardships to the Debtor in denying relief"); *see also In re Am. Classic Voyages, Co.*, 298 B.R. 222, 225 (D. Del. 2003) (similar).

## II.      The Trust Is Unlikely to Prevail on the Merits of the Corporate Claims.

49.      The Trust's final argument in support of its Motion is that it is likely to succeed on the merits of the Delaware Litigation. (Mot. at 21-22.) The merits of the Corporate Claims, however, are currently not before the Court. And in any event, as discussed *supra*, the Debtors have numerous arguments of their own.

<u>**Reservation of Rights**</u>

50.      The Debtors reserve all rights to supplement or add to the legal and factual arguments raised in this Objection and to object to the Motion, on any bases whatsoever, at a future date. Additionally, the Debtors reserve all rights to seek damages for violation of the automatic stay.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Debtors respectfully request that the Court deny the Motion and grant such further relief as is equitable and just.

Dated: August 13, 2020
      Houston, Texas                    Respectfully Submitted,

                                  By:    */s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
Emily D. Nasir (TX 24118477)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
eenglish@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
enasir@porterhedges.com

*Proposed Co-Counsel to the Debtors
and Debtors-in-Possession*

– and –

**SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP**

George N. Panagakis (admitted *pro hac vice*)
Anthony R. Joseph (admitted *pro hac vice*)
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Facsimile: (312) 407-0411
george.panagakis@skadden.com
anthony.joseph@skadden.com

– and –

23

Mark A. McDermott (admitted *pro hac vice*)
Jason N. Kestecher (admitted *pro hac vice*)
Nicholas S. Hagen (admitted *pro hac vice*)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
mark.mcdermott@skadden.com
jason.kestecher@skadden.com
nicholas.hagen@skadden.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.

*/s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
Emily D. Nasir (TX 24118477)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
eenglish@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
enasir@porterhedges.com

*Proposed Co-Counsel to the Debtors*
*and Debtors-in-Possession*

## Certificate of Accuracy

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.

*/s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
Emily D. Nasir (TX 24118477)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
eenglish@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
enasir@porterhedges.com

*Proposed Co-Counsel to the Debtors*
*and Debtors-in-Possession*